No. 26-10416

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

THE ESTATE OF DONALD A. KING, THE DUSTIN INMAN SOCIETY, INC.,

*Plaintiffs-Appellants,*

v.

THE SOUTHERN POVERTY LAW CENTER,

*Defendant-Appellee.*

*Appeal from the United States District Court
for the Middle District of Alabama*
No. 2:22-cv-00207-CLM-JTA

**APPELLANTS' OPENING BRIEF**

| | |
|---|---|
| Todd V. McMurtry | Mathew D. Staver |
| Scott R. Thomas | Horatio G. Mihet |
| J. Will Huber | Daniel J. Schmid |
| FINNEY LAW FIRM LLC | LIBERTY COUNSEL |
| 250 Grandview Dr., Ste. 500 | P.O. Box 540774 |
| Fort Mitchell, KY 41017 | Orlando, FL 32854 |
| (859) 578-3855 | (407) 875-1776 |
| todd@finneylawfirm.com | court@lc.org |
| scott@finneylawfirm.com | hmihet@lc.org |
| will@finneylawfirm.com | dschmid@lc.org |

James R. McKoon, Jr.
MCKOON & GAMBLE
P.O. Box 3220
Phenix City, AL 36868
(334) 297-2300
jrmckoon@aol.com

## DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Appellants the Estate of Donald A. King and the Dustin Inman Society, Inc. make the following disclosures:

The Estate of Donald A. King is not a corporation and therefore has no parent corporation and no publicly held corporation owning ten percent or more of its stock.

The Dustin Inman Society, Inc. is a nonprofit corporation organized under the laws of the State of Georgia. It has no parent corporation, and no publicly held corporation owns ten percent or more of its stock.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Fed. R. App. P. 34(a)(2) and Eleventh Circuit Rule 28-1(b), Appellants respectfully request oral argument. The factual record in this case is materially incomplete as a consequence of denied discovery, such that the briefs alone may not adequately convey the full evidentiary and procedural context necessary for an informed decision.

# TABLE OF CONTENTS

TABLE OF CITATIONS ..............................................................................vi

JURISDICTIONAL STATEMENT ..............................................................x

STATEMENT OF THE ISSUES...................................................................1

STATEMENT OF THE CASE ......................................................................3

    A.    Statement of the Facts ...................................................................3

          1.    Southern Poverty Law Center: The Power of "Hate"...........3

          2.    The Dustin Inman Society and D.A. King...........................5

          3.    SPLC Monitors DIS for Six Years and Declines to Designate It as a Hate Group—Until a Chance Phone Call................................................................................6

          4.    SPLC Designates DIS as an "Anti-Immigrant Hate Group" ........................................................................9

    B.    Procedural History.......................................................................11

          1.    The District Court Denies SPLC's Motion to Dismiss.......11

          2.    SPLC Resists Discovery into its Communications and Editorial Processes............................................................13

          3.    The District Court Grants Summary Judgment on An Incomplete Evidentiary Record .........................................14

    C.    Standards of Review ...................................................................18

SUMMARY OF ARGUMENT ..................................................................19

ARGUMENT ...........................................................................................22

I.    The district court denied discovery that was crucial to establishing circumstantial evidence of actual malice, and the resulting evidentiary gap caused the grant of summary judgment................22

    A.    A defamation plaintiff is entitled to discovery of circumstantial evidence of actual malice.......................................................24

B.   Appellants were entitled to discovery of SPLC's communications about Appellants and its editorial processes for analyzing and classifying "hate groups." ..................................27

C.   The discovery rulings were contrary to law. ............................30

1.   The defendant's pre-publication state of mind is relevant as to actual malice. ................................................................30

2.   Evidence of the defendant's knowledge about the plaintiff, either before or at the time of the challenged publication, is admissible as to actual malice. ..........................................34

D.   The discovery denial caused the summary judgment. ...............36

II.   The district court erred in confining its actual-malice analysis to the Spring 2021 re-designation while discounting the evidence from the 2017–2018 designation process. ...............................................40

A.   The district court erred in analyzing actual malice as though SPLC's institutional knowledge started from scratch in 2021. 40

B.   A reasonable jury could find that SPLC's treatment of Appellants before 2021 was probative evidence of actual malice. .........................................................................................45

III.  The district court applied incorrect legal standards for actual malice. ..................................................................................................49

A.   The district court treated SPLC's internal definition of "immigrant" as dispositive rather than applying the ordinary-reader standard. ................................................................50

B.   The district court treated evidence of motive as categorically irrelevant. ..........................................................................58

IV.   The district court erred in predicting that Alabama would apply the single-publication rule to bar the Extremist Profile claim. .............62

A.   Alabama has not adopted the single-publication rule for internet posts. ....................................................................63

B.  The rule protects "newspapers and similar media," and SPLC is neither................................................................................63

C.  Alabama's rule requires "verbatim republication," and the profile was not republished verbatim. ....................................64

D.  SPLC's annual re-dissemination constituted republication to a new audience.........................................................................66

CONCLUSION ...................................................................................68

## TABLE OF CITATIONS

**Cases**

*Age-Herald Publishing Co. v. Huddleston,*
  92 So. 193 (Ala. 1921) ............................................................................ 64

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ........................................................................... 55, 62

*Blankenship v. NBCUniversal, LLC,*
  60 F.4th 744 (4th Cir. 2023) .................................................................. 28

*Brown v. Nexus Bus. Sols., LLC,*
  29 F.4th 1315 (11th Cir. 2022) .............................................................. 18

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.,*
  6 F.4th 1247 (11th Cir. 2021) ........................................... 11, 53, 54, 58

*Dershowitz v. CNN, Inc.,*
  153 F.4th 1189 (11th Cir. 2025) ..................... 17, 41, 45, 57, 58, 59, 60

*DR Distribs., LLC v. 21 Century Smoking, Inc.,*
  513 F. Supp. 3d 839 (N.D. Ill. 2021) ................................................... 38

*Duffy v. Leading Edge Prods., Inc.,*
  44 F.3d 308 (5th Cir. 1995) ................................................................... 60

*Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.,*
  420 F.3d 1317 (11th Cir. 2005) ............................................................ 18

*Haitian Refugee Ctr., Inc. v. Baker,*
  953 F.2d 1498 (11th Cir. 1992) ............................................................ 30

*Harte-Hanks Commc'ns, Inc. v. Connaughton,*
  491 U.S. 657 (1989) ........................................ 2, 24, 25, 28, 46, 56, 59

*Herbert v. Lando,**
  441 U.S. 153 (1979) ............................... 1, 13, 14, 19, 27, 30, 31, 36, 44

*Horsley v. Rivera,*
  292 F.3d 695 (11th Cir. 2002) .................................................. 56, 57, 58

*Hunt v. Liberty Lobby,*
  720 F.2d 631 (11th Cir. 1983) .......................................................... 30, 32

*Hutchinson v. Proxmire,*
  443 U.S. 111 (1979) ............................................................................... 53

*Iraola & CIA, S.A. v. Kimberly-Clark Corp.*,
   325 F.3d 1274 (11th Cir. 2003) ............................................................ 18
*Johnson v. Clifton*,
   74 F.3d 1087 (11th Cir. 1996) .............................................................. 43
*Josendis v. Wall to Wall Residence Repairs, Inc.*,
   662 F.3d 1292 (11th Cir. 2011) ............................................................ 18
*Just. v. United States*,
   6 F.3d 1474 (11th Cir. 1993) ................................................................ 42
*Masson v. New Yorker Mag., Inc.*,
   501 U.S. 496 (1991) .............................................................. 56, 57, 59
*Milkovich v. Lorain J. Co.*,
   497 U.S. 1 (1990) ................................................................................ 56
*N.Y. Times Co. v. Sullivan*,
   376 U.S. 254 (1964) .......................................................... 22, 47, 51, 53
*Poff v. Hayes*,
   763 So. 2d 234 (Ala. 2000) ...................................................... 2, 63, 65
*Price v. Time, Inc.*,
   416 F.3d 1327 (11th Cir. 2005) ...................................................... 36, 63
*Rinaldi v. Viking Penguin, Inc.*,
   52 N.Y.2d 422 (1981) .......................................................................... 66
*Sanderlin v. Seminole Tribe of Fla.*,
   243 F.3d 1282 (11th Cir. 2001) ............................................................ 18
*Sconiers v. Lockhart*,
   946 F.3d 1256 (11th Cir. 2020) ............................................................ 51
*Shoen v. Shoen*,
   48 F.3d 412 (9th Cir. 1995) ................................................................. 60
*Solano v. Playgirl, Inc.*,
   292 F.3d 1078 (9th Cir. 2002) .............................................................. 24
*Spirito v. Peninsula Airport Comm'n*,
   350 F. Supp. 3d 471 (E.D. Va. 2018) .................................................. 60
*St. Amant v. Thompson*,
   390 U.S. 727 (1968) .......................................................... 22, 24, 25, 50

*Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*,
  330 F.3d 1110 (9th Cir. 2003) .......................................................... 24, 25
*Tah v. Global Witness Publ'g, Inc.*,
  991 F.3d 231 (D.C. Cir. 2021) ................................................................. 25
*Talley v. Time, Inc.*,
  923 F.3d 878 (10th Cir. 2019) ................................................................. 31
*Tavoulareas v. Piro*,
  759 F.2d 90 (D.C. Cir. 1985) ................................................................... 60
*Tavoulareas v. Piro*,
  817 F.2d 762 (D.C. Cir. 1987) .......................................................... 24, 25
*United States v. Ratcliff*,
  245 F.3d 1246 (11th Cir. 2001) ............................................................... 42
*United States v. Shamsid-Deen*,
  61 F.4th 935 (11th Cir. 2023) ................................................................. 30
*Veritas v. Cable News Network, Inc.*,
  121 F.4th 1267 (11th Cir. 2024) ...................................................... 25, 35

**Statutes**
8 U.S.C. § 1101 ............................................................................................ 54

**Other Authorities**
Bob Moser, *The Reckoning of Morris Dees and the Southern Poverty Law
  Center*, The New Yorker (Mar. 21, 2019) ............................................... 4
Ken Silverstein, *The Church of Morris Dees*, Harper's Magazine (Nov. 1,
  2000) .......................................................................................................... 4
Letter from Steve Marshall, Attorney General, State of Alabama, to
  Chuck Schumer, Senator, State of New York 1 (Mar. 22, 2023) .......... 4
Mark Potok, Address at the Michigan Alliance Against Hate Crimes
  Conference (2007) ..................................................................................... 5
Paul Bedard, *Support for Southern Poverty Law Center Links Scalise,
  Family Research Council Shooters*, Washington Examiner (June 14,
  2017) .......................................................................................................... 5

**Rules**

Fed. R. Civ. P. 12 ................................................................................11
Fed. R. Civ. P. 56 ................................................................................18

**Treatises**

53 C.J.S. Libel and Slander § 248 .......................................................34
David Elder, Defamation: A Lawyer's Guide § 7:7 ...............................31
Rodney Smolla, 1 Law of Defamation (2d ed.) ........................... 43, 47, 49

*\*Case on which Appellants primarily rely*

## JURISDICTIONAL STATEMENT

The district court exercised subject matter jurisdiction under 28 U.S.C. § 1332(a) based on diversity of citizenship between the parties. Doc. 134 at 1; Doc. 22 at 2.

The district court entered summary judgment for Defendant-Appellee on all counts on January 7, 2026. Doc. 135. Appellants timely filed a joint notice of appeal under Fed. R. App. P. 3(b)(1) (Doc. 136), designating both the order granting summary judgment (Doc. 134) and the order overruling Appellants' objections to the magistrate judge's denial of their motion to compel (Doc. 104). The discovery order merged into the final judgment and is reviewable on appeal. *See United States v. B. G. G.*, 53 F.4th 1353, 1365 (11th Cir. 2022).

This Court has appellate jurisdiction under 28 U.S.C. § 1291.

x

## STATEMENT OF THE ISSUES

I. Whether the district court erred in overruling Appellants' objections to the magistrate judge's denial of pre-publication discovery, where *Herbert v. Lando*, 441 U.S. 153 (1979), holds that the First Amendment permits inquiry into a defamation defendant's thoughts and editorial processes, the magistrate judge's order did not cite or distinguish *Herbert*, and the resulting evidentiary gap was the principal basis on which the district court granted summary judgment.

II. Whether the district court erred in limiting its actual-malice analysis to SPLC's most recent republication of its "anti-immigrant hate group" designation, while disregarding the substantial evidence of what SPLC knew about the Dustin Inman Society when it first made that designation in 2018, and that evidence remained directly relevant to SPLC's state of mind each time it republished the designation.

III. Whether the district court applied incorrect legal standards for actual malice by (a) treating SPLC's self-defined use of "anti-immigrant" as dispositive of SPLC's subjective knowledge rather than asking whether SPLC knew or recklessly disregarded that an ordinary reader would understand the designation to convey something false; and (b)

1

treating evidence of SPLC's motive as categorically irrelevant "evil intent or spite," rather than as circumstantial evidence bearing on actual malice under *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989).

IV. Whether the district court erred in predicting that the Alabama Supreme Court would apply the single-publication rule to bar the Extremist Profile claim, where the rule is limited to "newspapers and similar media" and requires "verbatim republication," *Poff v. Hayes*, 763 So. 2d 234, 242 n.5 (Ala. 2000), and SPLC is a nonprofit advocacy organization that edited the profile and disseminated it to new audiences annually as part of a recurring publication cycle.

## STATEMENT OF THE CASE

### A.  Statement of the Facts

### 1.  Southern Poverty Law Center: The Power of "Hate"

The Southern Poverty Law Center (SPLC) bills itself as "a nonprofit civil rights organization with a stated mission of advancing the human rights of all people." Doc. 116 at 11. Founded in 1971, SPLC eventually shifted away from defending minorities and death-row inmates toward fighting "right-wing extremism." Doc. 69 at 9.

As part of its expanded mission, SPLC created the Intelligence Project, which began compiling an annual list of organizations that SPLC deems to be "hate groups." Doc. 69 at 10. Each year, SPLC publishes on its website an interactive "Hate Map" identifying organizations it classifies as "hate groups." Doc. 114-13 at 18–22. SPLC also publishes an annual report, originally titled the "Intelligence Report" and later renamed "The Year in Hate and Extremism," which includes a printed version of the map. Doc. 134 at 28 n.10. And for certain designated groups, SPLC publishes an "Extremist Profile" page on its website. Doc. 114-7 at 46 (Beirich Dep. 174:10–18).

These products are distributed to media outlets as factual investigative reports. Doc. 22 at 37–38. For example, SPLC contends that

it uses these reports to "train law enforcement officers" in combating extremist groups. Doc. 114-7 at 18 (Beirich Dep. 64:1–17).

The "hate group" program has been extraordinarily successfully for SPLC's fundraising efforts as well. *See generally* Doc. 69 at 6 (citing Ken Silverstein, *The Church of Morris Dees*, Harper's Magazine (Nov. 1, 2000)); *id.* at 12–13 (citing Bob Moser, *The Reckoning of Morris Dees and the Southern Poverty Law Center*, The New Yorker (Mar. 21, 2019)).

It also serves as a highly potent weapon. Several state attorneys general, including the Attorney General of Alabama, warned that "SPLC is infamous for leveling unfounded charges of 'hate' against political opponents." Doc. 53-11; Doc. 69 at 12 (quoting Letter from Steve Marshall, Attorney General, State of Alabama, to Chuck Schumer, Senator, State of New York 1 (Mar. 22, 2023)).

Mark Potok, the former director of SPLC's Intelligence Project, was frank about its purpose: "Sometimes the press will describe us as monitoring hate groups. I want to say plainly that our aim in life is to destroy these groups. Completely destroy them." Doc. 69 at 13 (quoting

4

Mark Potok, Address at the Michigan Alliance Against Hate Crimes Conference (2007)).[1]

### 2.    The Dustin Inman Society and D.A. King

In 2005, the late Donald A. King founded the Dustin Inman Society (DIS) to advocate for the enforcement of federal immigration laws. Doc. 114-11 at 3. King named DIS after a teenager from the Atlanta area who was killed in an automobile accident involving an illegal immigrant. Doc. 114-3 at 4 (King Dep. 9:17–25).

From its inception, DIS was a legislative advocacy organization. King wrote articles on immigration issues, Doc. 114-1 at 6 (King Dep. 15:23–25), gave speeches, *id.* at 7 (18:5–8), appeared on television, *id.* (21:19–21), advocated for pro-enforcement legislation in Georgia, *id.* at 8 (24:15–25:13), and lobbied lawmakers, *id.*

---

[1] The "hate group" designation also has darker consequences. A gunman who attempted to massacre employees at the Family Research Council later admitted that he identified the organization as a target from SPLC's website. Doc. 52-16 at 6; Doc. 69 at 4 (citing Statement of Offense, *United States v. Corkins*, No. 1:12-CR-0182 (D.D.C. 2013)). Similarly, the gunman who shot Rep. Steve Scalise in 2017 was a "fan[] of the Southern Poverty Law Center." *See* Paul Bedard, *Support for Southern Poverty Law Center Links Scalise, Family Research Council Shooters*, Washington Examiner (June 14, 2017), https://perma.cc/YB6A-UL2Q.

Neither King nor DIS opposed lawful immigration. Doc. 114-1 at 43 (King Dep. 165:17–25). DIS has repeatedly voiced its support for immigration and for immigrants. Doc. 114-3 at 20 (King Dep. 70:9–18); Doc. 114-5 at 24 (King Dep. 238:9–15), 25 (244:3–15), 26 (248:4–15). King's sister was a legal immigrant to the United States. Doc. 114-3 at 8 (King Dep. 23:1–9). And DIS's board of advisors included legal immigrants. Doc. 114-3 at 7 (King Dep. 19:24–21:4).

### 3. SPLC Monitors DIS for Six Years and Declines to Designate It as a Hate Group—Until a Chance Phone Call

SPLC began tracking DIS no later than 2011. At that time, SPLC classified DIS as a "nativist extremist" group, Doc. 114-10 at 9, a lesser designation suggesting that DIS "target[ed] individual immigrants rather than immigration policies," *id.* at 6.

In 2011, Heidi Beirich, the director of SPLC's Intelligence Project, explained publicly why DIS did not qualify as a "hate group," telling a reporter that King's "tactics have generally not been to get up in the face of actual immigrants and threaten them." Doc. 21 ¶ 17; Doc. 114-10 at 3. Beirich continued: "Because he is fighting, working on his legislation

6

through the political process, that is not something we can quibble with, whether we like the law or not." *Id.*

That assessment held for six years—until October 2017. A reporter for the *Atlanta Journal-Constitution* writing a story about King and DIS called SPLC for a comment. Doc. 114-14 at CONF.0142–46 (AJC reporter email, filed under seal at Doc. 115-1). The reporter informed SPLC that DIS was soliciting donations through U.S. Inc., an entity founded by a controversial activist, John Tanton. Doc. 114-14 at CONF.0145.

Beirich apparently had not known about this financial connection. Doc. 114-7 at 23 (Beirich Dep. 85:5–25). To SPLC, Tanton was an archnemesis. As Beirich put it, "[n]obody has done more to build the fervor against immigrants, racist fervor against immigrants in modern times than John Tanton." Doc. 114-7 at 24 (Beirich Dep. 87:12–15). If DIS was soliciting funds through a Tanton group, Beirich concluded, then that must mean that DIS "was working very closely with white supremacists." Doc. 114-7 at 24 (Beirich Dep. 88:2–4).

What followed was swift. Beirich told the AJC reporter publicly that SPLC "was going to take a new look at the Dustin Inman Society." Doc. 114-14 at CONF.0004, 0142. SPLC thus set about to support Beirich's

conclusion that, on the basis of this alleged Tanton connection, DIS "was working very closely with white supremacists." Doc. 114-7 at 24 (Beirich Dep. 88:2–4).

The decision came two months later. SPLC research analyst Swathi Shanmugasundaram prepared a report proposing that DIS be elevated from "nativist extremist" to "anti-immigrant hate group." Doc. 114-14 at CONF.0007–09; Doc. 114-6 at 31–32 (Levi Dep. [SPLC Fed. R. Civ. P. 30(b)(6) Dep.] 117:3–118:17); Doc. 114-14 at CONF.0008–0009 (Shanmugasundaram report). The report cited DIS's acceptance of donations through U.S. Inc., King's writings for *The Social Contract Press*, King's social media posts, and DIS's legislative campaign activities. Doc. 114-14 at CONF.0009.

Beirich reviewed the report and approved the designation in December 2017. Doc. 114-6 at 31, 51 (Levi Dep. 118:11–17, 198:18–199:4). In her view, the activities revealed in the report "go beyond lobbying." Doc. 114-7 at 31 (Beirich Dep. 116:1–15).

But nothing about DIS had changed. DIS was doing what it had done for the preceding six years: the same legislative and public advocacy against illegal immigration. What had changed was SPLC's awareness of

8

an alleged financial link to Tanton. Yet DIS had never, publicly or privately, embraced or endorsed any of the rhetoric that Tanton espoused. Doc. 114-3 at 33 (King Dep. 124:8–25; 125:1–9). In fact, DIS explicitly and repeatedly opposed and rejected those viewpoints. Doc. 114-3 at 5 (King Dep. 12:17–25; 13:5–14), 8 (24:11–25; 25:1–2), 9 (27:8–25; 28:1–3), 10 (32:12–25), 11 (36:12–25; 37:1–4).

### 4. SPLC Designates DIS as an "Anti-Immigrant Hate Group"

On February 10, 2018, SPLC publicly designated DIS as an "anti-immigrant hate group" in the Spring 2018 Intelligence Report and on its Hate Map. Doc. 114-6 at 14 (Levi Dep. 46:2–47:11); Doc. 114-10 at 69. The Spring 2018 Intelligence Report did not define "anti-immigrant hate group" and said nothing else about DIS. *Id.* at 8.

Over the next few months, Shanmugasundaram and others at SPLC prepared an "Extremist Profile" for DIS, Doc. 114-8 at 10 (Shanmugasundaram Dep. 30:14–31:13). SPLC published the profile on its website around January 7, 2019. Doc. 114-12 ¶ 3. The profile's introductory sentence stated: "The Dustin Inman Society, led by D.A. King, poses as an organization concerned about immigration issues, yet focuses on vilifying all immigrants." Doc. 114-12 at 7.

9



# DUSTIN INMAN SOCIETY

SPLC DESIGNATED HATE GROUP

**FOUNDED:** 2003
**LOCATION:** Marietta, Georgia

Share

**The Dustin Inman Society, led by D.A. King, poses as an organization concerned about immigration issues, yet focuses on vilifying all immigrants.**

The Dustin Inman Society is a Georgia-based anti-immigrant hate group founded and led by activist D.A. King. The Southern Poverty Law Center lists it as an anti-immigrant hate group because it denigrates immigrants and supports efforts to make the lives of immigrants so hard that they leave on their own—a tactic known as "attrition through enforcement." Despite his regular demonization of immigrants, King finds allies in the Georgia State Legislature and has played a significant role in passing anti-immigrant legislation in Georgia for more than a decade. King is also comfortable working with some of the most hardcore elements of the anti-immigrant movement, including white nationalists.

Doc. 134 at 8.

After the initial designation, SPLC re-designated DIS as a "hate group" annually. For the 2020 and 2021 editions, Keegan Hankes, SPLC's Interim Research Director, approved the re-designation based on a research analyst's report on DIS's activities for the previous year. Doc. 114-15 ¶¶ 7, 10 (Hankes Decl.).

10

The most recent version of DIS's "Extremist Profile" is not a verbatim republication of the original publication. Doc. 116 at 19. Between 2019 and 2022, SPLC changed several aspects. For example, SPLC hyphenated a racial slur in a quoted passage to conform with a change in editorial policy, and it later migrated the profile to a new URL. Doc. 114-12 ¶¶ 4–5 (SPLC Fed. R. Civ. P. 30(b)(6) Decl.). SPLC also updated hyperlinks within the profile on several occasions, which linked to other articles and materials on SPLC's website. Doc. 122-1 at 2–8. The introductory sentence was not altered. Doc. 114-12 ¶ 3. In all, SPLC altered the profile at least twelve times since its initial publication. Doc. 122-1 at 3–9.

### B. Procedural History

#### 1. The District Court Denies SPLC's Motion to Dismiss

Appellants first sued SPLC in state court in February 2020. SPLC removed the case to federal court. Following this Court's decision in *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247 (11th Cir. 2021), the district court (Judge Marks) dismissed the complaint under Rule 12(b)(6) for failure to plead sufficient facts to establish actual

malice. Appellants re-filed this action on April 27, 2022, pleading additional facts alleging that SPLC acted with actual malice. Doc. 1.

SPLC again moved to dismiss, but the district court (Judge Watkins) denied its motion in substantial part. Doc. 20, 22. Two aspects of the opinion bear on this appeal. First, Judge Watkins identified five factual theories that, if proved, could establish actual malice: (1) SPLC ignored that King's sister was a legal immigrant and DIS had legal immigrants on its board; (2) SPLC ignored that DIS lobbied against illegal immigration only; (3) SPLC registered lobbyists against a DIS-supported bill and believed the hate-group label would benefit SPLC's lobbying position; (4) SPLC turned a blind eye to DIS's Tanton ties until politically expedient; and (5) SPLC conducted a less rigorous investigation because it had already decided to designate DIS as a "hate group" for political reasons. Doc. 22 at 49–54.

Second, Judge Watkins found that SPLC's statements were factual assertions, not protected opinion, in part because SPLC holds itself out as a "premier" investigative organization that "offer[s] expert analysis to the media and public." Doc. 22 at 37–38. Under those circumstances, a

12

reasonable reader would understand SPLC's designation as "factually based after extensive investigation," not as rhetorical opinion. *Id.*

### 2. SPLC Resists Discovery into its Communications and Editorial Processes

In September 2023, the case was reassigned to the current presiding district court judge. Doc. 46. That same month, Appellants propounded discovery seeking SPLC's internal policies and procedures for classifying hate groups, email communications about DIS from 2011 forward, and communications about SPLC's methodology as applied to other immigration-related groups. Doc. 69 at 10. SPLC objected on the basis of a claimed "Reporter's Privilege" and overbreadth. Doc. 104 at 4. SPLC produced documents beginning January 1, 2017, and produced all "raw data" about DIS from its database. *Id.*

Appellants moved to compel the withheld discovery, invoking *Herbert v. Lando*, 441 U.S. 153 (1979). Doc. 69 at 15–17. Appellants sought three categories of information: (1) SPLC's internal policies and procedures for designating hate groups; (2) communications about DIS from 2011 (when SPLC began monitoring DIS) forward; and (3) materials concerning SPLC's methodology as applied to other groups in the immigration context. Doc. 69 at 10–12.

The magistrate judge denied the motion in a three-page order that found the requested discovery "neither relevant … nor proportional." Doc. 88. The order did not cite *Herbert*. Nor did it address the Reporter's Privilege. And it did not explain why editorial-process discovery was irrelevant in an actual-malice case. *Id.*

Appellants timely objected. Doc. 98. The district court overruled the objections, reasoning that because actual malice focuses on SPLC's state of mind at the time of publication, and thus pre-2017 communications were irrelevant to the 2021 re-designation. Doc. 104 at 4. The district court also deemed discovery regarding other groups irrelevant and suggested that Appellants could instead pursue the information through depositions. *See id.* at 5–6. As with the magistrate judge's order, the district court's order did not cite *Herbert*.

### 3. The District Court Grants Summary Judgment on An Incomplete Evidentiary Record

In May 2025, SPLC moved for summary judgment on all claims, Doc. 113, which the district court granted in January 2026, Docs. 134, 135.

*Statute of limitations.* The district court held that Alabama's two-year statute of limitations barred all claims arising from the 2018, 2019,

14

and 2020 editions of the Hate Map and Intelligence Report. Doc. 134 at 22–23. Only the Spring 2021 re-designation survived. *Id.* at 23.

*Single-publication rule.* The district court predicted that the Alabama Supreme Court would extend the single-publication rule to internet posts and applied it to time-bar King's Extremist Profile claim (Count 4). Doc. 134 at 24–27. The district court reasoned that unedited internet posts "project the same words to viewers across many locations," analogizing them to newspapers. *Id.* at 26. The district court determined that the Extremist Profile's introductory sentence had not been altered since January 7, 2019, and thus it presented "the identical libel" throughout. *Id.* at 26–27. The district court did not address whether SPLC qualified as "newspapers and similar media" under *Poff v. Hayes*, 763 So. 2d 234, 242 n.5 (Ala. 2000), whether the modifications to the profile's non-introductory portions defeated the "verbatim republication" requirement, or whether SPLC's annual re-dissemination of the Hate Map and linked profiles constituted republication to a new audience.

*"Of and concerning" King.* The district court found that the Spring 2021 Hate Map and "Year in Hate" report did not mention King by name

15

and therefore could not have defamed him. Doc. 134 at 28–29. The district court granted summary judgment on the Estate's claims. *Id.* at 29.

*Actual malice.* The district court's analysis of actual malice, which consumed the opinion's final ten pages, rested primarily on two propositions. Doc. 134 at 30–39.

First, the district court held that because they did not dispute Statement of Undisputed Fact No. 45, Appellants effectively admitted that they "cannot prove the facts needed for actual malice." Doc. 134 at 31. The district court stated that it "could end its opinion here" but went on to address the 2017–2018 evidence. *Id.*

Second, the district court explained what had changed between the Rule 12 denial and summary judgment. Doc. 134 at 31. On the meaning of "anti-immigrant," the district court found that DIS had conceded SPLC's broad definition of "immigrant" (encompassing persons who enter the United States illegally) and that King had testified one could call DIS "anti-immigrant" under that definition. *Id.* at 32–34. On motive, the district court found that the remaining Tanton-based theory went to "evil intent or a motive arising from spite or ill will," which the district court deemed categorically irrelevant to actual malice under this Court's

16

decision in *Dershowitz v. CNN, Inc.*, 153 F.4th 1189, 1193 (11th Cir. 2025). Doc. 134 at 35–36.

In Footnote 9, though finding Count 4 time-barred, the district court addressed the merits of the Extremist Profile claim in dicta. Doc. 134 at 27 n.9. The district court stated that SPLC's claim that DIS "focuses on vilifying all immigrants" was "non-actionable rhetorical hyperbole." *Id.* This dictum is in tension with Judge Watkins's Rule 12 holding that SPLC's statements were factual assertions susceptible of being proved true or false. Doc. 22 at 37–38.

Appellants noticed this appeal on February 5, 2026, designating the summary judgment order (Doc. 134), the final order (Doc. 135), and the order overruling objections to the magistrate's discovery ruling (Doc. 104). Doc. 136.

17

## C.  Standards of Review

The Court reviews the district court's denial of a motion to compel discovery for an abuse of discretion. *See Sanderlin v. Seminole Tribe of Fla.*, 243 F.3d 1282, 1285 (11th Cir. 2001). Under that standard, the Court will overturn a discovery ruling if the district court "made a clear error of judgment, or has applied the wrong legal standard," *Guideone Elite Ins. v. Old Cutler Presbyterian Church, Inc.*, 420 F.3d 1317, 1325 (11th Cir. 2005), and the ruling "resulted in substantial harm to the appellant's case," *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1307 (11th Cir. 2011) (quoting *Iraola & CIA v. Kimberly-Clark Corp.*, 325 F.3d 1274, 1286 (11th Cir. 2003)).

The Court reviews grants of summary judgment de novo. *See Brown v. Nexus Bus. Sols., LLC*, 29 F.4th 1315, 1317 (11th Cir. 2022). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)). On summary judgment review, the Court views all evidence in "the light most favorable to the nonmoving party" and draws "all justifiable inferences in that party's favor." *Id.* at 1317–18 (citation modified).

18

## SUMMARY OF ARGUMENT

The district court found no evidence of actual malice. That finding was not the product of an evidentiary failure. It was the product of four compounding legal errors, each of which narrowed the inquiry a little further, until nothing was left for a jury to decide.

*First*, the discovery ruling. For over a decade, SPLC monitored DIS through its Intelligence Project. Its analysts gathered information, exchanged emails, deliberated over how to classify DIS, and applied its methodology to reach conclusions it later reversed. The Supreme Court held that "the thoughts and editorial processes of the alleged defamer would be open to examination." *Herbert v. Lando*, 441 U.S. 153, 160 (1979). But the district court said no. What remained was a record stripped of the evidence on which defamation plaintiffs depend. The district court then granted summary judgment because that evidence was missing. The circularity is reversible error.

*Second*, having confined the actionable claims to the 2021 re-designation, the district court analyzed actual malice as though SPLC's institutional knowledge began afresh each calendar year. But Beirich, who publicly acknowledged in 2011 that DIS was not a hate group, was

19

the same person who approved the 2018 designation. Hankes did not investigate DIS independently. He simply reapproved a classification that Beirich authorized under the very circumstances that Appellants allege gave rise to actual malice. The statute of limitations bars stale claims; it does not bar relevant evidence.

*Third*, the district court analyzed what remained of the record under two wrong legal standards. It treated the question of whether DIS fit SPLC's private definition of "anti-immigrant" as dispositive of actual malice when that question bears only on the defense of truth. Actual malice asks whether the publisher knew or recklessly disregarded that an ordinary reader would receive false information. The ordinary reader does not consult SPLC's private lexicon. Whether SPLC knew its label conveyed a false message to the ordinary reader is a question for the jury, not a question the publisher answers by invoking its own definitions.

The district court also treated evidence of motive as categorically inadmissible. That conclusion is flatly inconsistent with Supreme Court precedent. By dismissing an entire category of circumstantial evidence as per se irrelevant, the district court removed a pillar of Appellants' case and then declared the structure could not stand.

*Fourth*, the district court barred the Extremist Profile claim by predicting that Alabama would apply the single-publication rule to internet posts. But the Alabama Supreme Court has never so held, and the district court's prediction failed to account for three features of Alabama law that distinguish this case. The rule protects only "newspapers and similar media," and SPLC is an advocacy organization, not a newspaper. The rule applies only to "verbatim republications," and SPLC modified the profile and updated its hyperlinks. And the rule does not protect publishers who affirmatively redistribute a publication to a new audience, which is precisely what SPLC seeks through its annual Hate Map update.

None of these errors stands alone. The discovery ruling thinned the record. The temporal limitation narrowed the inquiry. The wrong legal standards drained what remained of its probative force. And the single-publication ruling eliminated a claim that, had it survived, would have invigorated the entire case. The "no evidence" conclusion did not reflect any weakness in Appellants' case. It reflected the cumulative force of four rulings that made the case nearly impossible to prove.

## ARGUMENT

I.    **The district court denied discovery that was crucial to establishing circumstantial evidence of actual malice, and the resulting evidentiary gap caused the grant of summary judgment.**

To recover for defamation, a public-figure plaintiff must prove that the defamatory statement was published with "actual malice"—that is, "knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). "Reckless disregard" is a standard that "cannot be fully encompassed in one infallible definition" and requires a "case-by-case adjudication." *St. Amant v. Thompson*, 390 U.S. 727, 730 (1968).

The district court granted summary judgment after concluding that Appellants had "no evidence" of actual malice. Doc. 134 at 32. Even if that conclusion were partly correct, it would be only in the narrowest sense. Appellants lacked evidence because the district court denied them the discovery that would have produced it.

Through its Intelligence Project, SPLC monitored DIS for over a decade. During that time, SPLC's analysts compiled research, exchanged emails, deliberated, and applied its methodology to determine how to

22

classify DIS. Those materials sit in SPLC's files. Appellants asked for them. But the district court said no.

The Supreme Court, however, has said yes. In *Herbert v. Lando*, 441 U.S. 153 (1979), the Court held that the First Amendment does not bar a defamation plaintiff from inquiring into the defendant's knowledge and editorial processes where the inquiry will produce evidence material to proof of actual malice. The Court was direct: "Inevitably, unless liability is to be completely foreclosed, the thoughts and editorial processes of the alleged defamer would be open to examination." *Id.* at 160.

Those words describe this case with uncomfortable precision. Liability was, in effect, "foreclosed," *id.* at 160, because SPLC's thoughts and editorial processes were closed to examination. And the district court granted summary judgment on what little remained: a self-serving declaration from an alleged decisionmaker whom nobody deposed. That was error.

23

**A. A defamation plaintiff is entitled to discovery of circumstantial evidence of actual malice.**

No publisher announces that it entertained serious doubts about the truth of its own statements. *See Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1135 (9th Cir. 2003) (en banc) ("we have yet to see a defendant who admits to entertaining serious doubt about the authenticity of an article it published" (quoting *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1087 (9th Cir. 2002)). Instead, actual malice is proved "through the cumulation of circumstantial evidence." *Tavoulareas v. Piro*, 817 F.2d 762, 789 (D.C. Cir. 1987).

Courts have identified a broad range of circumstantial evidence probative of actual malice:

- o The publisher had obvious reasons to doubt the accuracy of its report. *See St. Amant*, 390 U.S. at 732;
- o The publisher purposefully avoided the truth by failing to consult available evidence or making a "deliberate decision not to acquire knowledge of facts that might confirm the probable falsity" of the publication. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989).
- o The publisher departed from its own professional or investigative standards. *See Harte-Hanks*, 491 U.S. at 682–83; *Suzuki*, 330 F.3d at 1138;
- o Financial incentives, political objectives, or institutional interests gave the publisher a reason to publish regardless of the

24

truth. *See Harte-Hanks*, 491 U.S. at 668; *Suzuki*, 330 F.3d at 1135–36;

- o The publisher began with a preconceived storyline and ignored evidence that contradicted it. *See Tah v. Global Witness Publ'g, Inc.*, 991 F.3d 231, 243–44 (D.C. Cir. 2021); *Suzuki*, 330 F.3d at 1136–38;
- o The publisher possessed information, including from its own prior reporting, that seriously undermined the truth of its published statements. *See Veritas v. Cable News Network, Inc.*, 121 F.4th 1267, 1283–84 (11th Cir. 2024);
- o The publisher manipulated its investigative process to produce a predetermined result. *See Suzuki*, 330 F.3d at 1135; and
- o The publisher made prior inconsistent statements about the plaintiff that contradict the subsequent defamatory publication. *See Veritas*, 121 F.4th at 1283–84; *St. Amant*, 390 U.S. at 732.

A plaintiff may rely on the cumulative weight of such evidence because "each individual piece of evidence cannot fairly be judged individually against the standard of clear and convincing evidence," and "[p]laintiffs are entitled to an aggregate consideration of all their evidence." *Tavoulareas*, 817 F.2d at 794 n.43; *see also Harte-Hanks*, 491 U.S. at 668.

What a plaintiff is *not* required to extract is a confession. A defendant's self-serving testimony that it believed in the truth of its statements "cannot, by itself, defeat summary judgment." *Suzuki*, 330 F.3d at 1134–35 (quoting *St. Amant*, 390 U.S. at 732).

Each category of discovery Appellants sought corresponds to a recognized category of circumstantial evidence of actual malice. The magistrate judge denied them all, finding the discovery "neither relevant … nor proportional." Doc. 88 at 2. The district court affirmed. Doc. 104. And what remained after these rulings was a record stripped of the circumstantial evidence that defamation plaintiffs depend on and that *Herbert* entitles them to obtain.

Although they had the public record, SPLC's raw database entries on DIS, and the post-2017 email communications that SPLC chose to produce, Doc. 104 at 4, Appellants had no window into SPLC's editorial deliberations during the six years it concluded DIS did not warrant the hate-group designation. Nor did they have documents against which to test Hankes's declaration that he "never had any reason to doubt" the designation. Doc. 114-15 ¶ 11. And they had no basis for comparing how SPLC treated DIS to how it treated other immigration groups.

In short, they had none of the circumstantial evidence that courts from *Herbert* to *Veritas* have recognized as the ordinary means of proving actual malice. The district court then granted summary judgment because Appellants had "no evidence" of actual malice. Doc. 134 at 32.

26

But the absence of evidence here was not a failure of Appellants' case. It was the foreseeable consequence of the discovery rulings that preceded it.

**B. Appellants were entitled to discovery of SPLC's communications about Appellants and its editorial processes for analyzing and classifying "hate groups."**

Under *Herbert*, Appellants were entitled to discover SPLC's internal editorial processes for analyzing and classifying organizations as "hate groups," including the policies, communications, and documents that would reveal what SPLC knew about DIS and how SPLC reached the decision to designate it.

Appellants sought three categories of editorial-process discovery. Doc. 69 at 10–12. Each one maps directly onto the actual-malice inquiry.

First, email communications about DIS from 2011 forward. SPLC began monitoring DIS in 2009. Doc. 114-10 at 9. In 2011, Beirich told a reporter that DIS did not qualify as a hate group because King was "working on his legislation through the political process." Doc. 114-10 at 3. For the next six years, SPLC maintained that assessment. What were SPLC's analysts saying internally during those six years? Did they consider a hate-group designation and reject it? Did they identify facts

that cut against the later designation? Did anyone express doubt? Those questions have answers. The answers are possibly in the emails and other communications. Discovery of these communications was denied.

Second, SPLC's internal policies and procedures for designating hate groups. These documents would reveal the criteria SPLC purported to apply, the steps its analysts and supervisors were supposed to follow, and the standards of rigor the process was supposed to meet. If SPLC departed from its own standards in designating DIS, that departure— although not dispositive—is circumstantial evidence that the designation was driven by something other than a good-faith assessment. *See Blankenship v. NBCUniversal, LLC*, 60 F.4th 744, 763 (4th Cir. 2023) (noting that "[a] violation of journalistic standards may be relevant when combined with other proof of actual malice"). The Supreme Court in *Harte-Hanks* found actual malice based on the whole record, including the newspaper's departure from its own investigative practices. 491 U.S. at 682–83, 691–92. SPLC's methodology is the equivalent of the professional-standards evidence that supported the verdict in *Harte-Hanks*. This inquiry was denied.

Third, materials concerning SPLC's methodology as applied to other immigration-related groups. Doc. 69 at 10–12. If SPLC classified other groups with comparable Tanton-network ties as mere "nativist extremists" while elevating DIS to "anti-immigrant hate group," then the disparity would be powerful circumstantial evidence that the DIS designation was motivated by a reckless assumption that DIS "was working very closely with white supremacists." Doc. 114-7 at 24 (Beirich Dep. 88:2–4). Discovery of the methodology materials was denied.

To be clear, SPLC did produce its database entries on DIS ("raw data") and email communications from 2017 forward. Doc. 104 at 4. The district court treated this production as adequate. *Id.* at 4–5. It was not. *Herbert* distinguishes between the factual materials underlying a publication and the editorial process that produced it. *See* 441 U.S. at 160, 164–65. The raw data that was produced show what information SPLC collected. The editorial-process documents that were denied would show what SPLC did with what it collected, what it considered, what it ignored, and why it changed its position. The former was produced. The latter was withheld.

29

### C.   The discovery rulings were contrary to law.

Appellants' motion to compel briefed *Herbert* extensively. Doc. 69 at 20–22. The failure to apply binding Supreme Court precedent governing editorial-process discovery in actual-malice cases renders the ruling "contrary to law" under Rule 72(a), which this Court reviews de novo as to the underlying legal question. *See Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1505 (11th Cir. 1992) (noting that if the lower court misapplies the law, then the reviewing court "will review and correct the error without deference to that court's determination"); *see also United States v. Shamsid-Deen*, 61 F.4th 935, 944 (11th Cir. 2023) (explaining that de novo review is appropriate for rulings on issues of law—including those that apply law to fact—because the reviewing court "is in as good a position to decide them as a district court is").

### 1.   The defendant's pre-publication state of mind is relevant as to actual malice.

The district court denied discovery of the pre-2017 communications because it concluded that the actual-malice inquiry "focuses on the defendant's state of mind at the time of publication." Doc. 104 at 4 (quoting *Hunt v. Liberty Lobby*, 720 F.2d 631, 647 (11th Cir. 1983)). Given that the publications at issue were in 2018 through 2021, the district

court reasoned, SPLC's state of mind in the years before the designation was irrelevant. *Id.* That conclusion oversimplified *Hunt* and reflects a misunderstanding of how actual malice is proven.

To begin with, the rule that actual malice focuses on the defendant's state of mind at the time of publication is generally a limitation on *post*-publication evidence: a plaintiff generally cannot prove actual malice by pointing to what the defendant learned *after* the statement was published, because what the defendant learned later generally sheds no light on what the defendant knew when it chose to publish. *E.g.*, *Talley v. Time, Inc.*, 923 F.3d 878, 901 n.23 (10th Cir. 2019). That rule does not exclude *pre*-publication evidence. *See* David Elder, Defamation: A Lawyer's Guide § 7:7 ("The Supreme Court's abbreviated references to the temporal requirement do not preclude … the admissibility of and reliance on some types of evidence that relate back to and provide inferential evidence of defendant's knowing or reckless disregard of falsity at the time of publication.").

Indeed, the Supreme Court in *Herbert* held that plaintiffs may inquire into the defendant's "thoughts, opinions, and conclusions of the publisher," 441 U.S. at 170, all of which necessarily occur *before*

31

publication. After all, the editorial process is, by definition, a pre-publication process. A rule that excluded pre-publication evidence from the actual-malice inquiry would negate *Herbert* entirely.

Setting aside its post-publication focus, the *Hunt* rule makes sense when the defendant is a newspaper that assigns a reporter to investigate a subject, write an article, then publish it under a deadline. In that context, there is a discrete moment of publication, and thus the natural focus is on the reporter's state of mind at that moment.

But SPLC is not a newspaper. Nor is it a publisher in the traditional sense. And it did not post its "anti-immigrant hate group" designation under a deadline. SPLC is an advocacy and fundraising organization. It tracked DIS through its Intelligence Project for over a decade. Its analysts gathered information about DIS year after year, compiled that information in internal databases, exchanged emails assessing DIS's activities, and applied SPLC's methodology to determine how DIS should be classified. Doc. 114-6 at 12 (Levi Dep. 41:5–9). In short, SPLC's assessment of DIS was not captured in a snapshot; it was a running institutional judgment, formed over the years and updated continuously. When SPLC designated DIS in 2018 and re-designated it annually

32

through 2021, it drew on everything it had learned since it first began monitoring DIS as far back as 2011.

For a watchdog group, asking what the decisionmaker knew "at the time of publication" is asking the wrong question. The right question is what the organization *knew all along*. Beirich monitored DIS from 2011 and publicly concluded DIS was not a hate group. Doc. 114-10 at 3. When she reversed that assessment in 2017, she did not start from a blank slate; she carried forward everything SPLC had previously learned and concluded about DIS.

Despite that knowledge, Beirich approved the proposal to elevate DIS to an "anti-immigrant hate group." Doc. 114-7 at 28 (Beirich Dep. 104:14–105:11). And multiple SPLC staff members collaborated to prepare DIS's "Extremist Profile." Doc. 114-14 at CONF.0054–0131 (staff emails). So when Hankes approved the annual renewals in 2020 and 2021, he inherited the institutional record that Beirich and her analysts had built. He did not independently investigate DIS. He approved the continuation of a classification that others had created. Doc. 114-15 ¶¶ 7, 10.

33

In this context, confining the actual-malice inquiry to Hankes's state of mind "at the time of publication" severs his decision from SPLC's knowledge bank. It thus allows SPLC to shield years of accumulated knowledge behind a single employee's declaration that he "never had any reason to doubt" the designation. Doc. 114-15 ¶ 11. A watchdog group that reverses a longstanding assessment should face greater scrutiny of what it knew before the reversal, because the reversal is comprehensible *only in light of what preceded it.*

## 2. Evidence of the defendant's knowledge about the plaintiff, either before or at the time of the challenged publication, is admissible as to actual malice.

This Court should hold that because SPLC, as a watchdog group, tracked Plaintiffs over an extended period, the actual-malice inquiry encompasses what the organization knew throughout that period, not merely what a single decisionmaker professed to believe at the moment of the latest annual renewal. *Accord* 53 C.J.S. Libel and Slander § 248 ("As a general rule, *anything* that tends to show *the relations between the parties*, or the defendant's feelings toward the plaintiff, *prior to* or at the time of the publication or utterance, is admissible as bearing on the question of malice." (emphasis added)). The district court's confinement

34

of the inquiry to the 2021 re-designation, and its exclusion of the 2011–2017 evidence on temporal-relevance grounds, was legal error.

This Court recognized the point in *Veritas*. There, actual malice was inferred from the gap between CNN's prior accurate reporting, a tweet correctly identifying the reason for the plaintiff's suspension from Twitter, and CNN's subsequent on-air mischaracterization of that same event four days later. 121 F.4th at 1283–84. If four days of prior accurate knowledge supports an inference of actual malice, then *six years* of institutional monitoring and a public determination that DIS did not meet the hate-group criteria should at least be discoverable.

The district court's treatment of the other-groups materials fares no better. The district court dismissed the request as a "fishing expedition" and suggested Appellants could pursue the information through depositions. Doc. 104 at 5–6. That suggestion reflects a misunderstanding of editorial-process discovery. Documents reveal the contemporaneous state of the editorial process: what analysts wrote at the time, what supervisors approved at the time, what doubts were expressed at the time. Depositions, taken years after the fact, reveal only what the witness remembers or chooses to disclose. *Herbert* does not limit

plaintiffs to depositions when documents exist. The Court's holding encompasses "the thoughts and editorial processes of the alleged defamer." 441 U.S. at 160. Documents are the medium through which those thoughts are recorded.

To the extent that SPLC reasserts its "Reporter's Privilege" on remand, that privilege does not apply here. SPLC is not a journalist or newsgathering agency; it is an advocacy organization that classifies "hate groups" to advance its institutional mission and solicit donations. Even if SPLC could establish journalist status, the privilege applies only to protecting confidential sources, *see Price v. Time, Inc.*, 416 F.3d 1327, 1343 (11th Cir. 2005), and Appellants do not seek confidential sources. Most fundamentally, *Herbert* itself forecloses the privilege in actual-malice defamation cases: "Evidentiary privileges in litigation are not favored, and even those rooted in the Constitution must give way in proper circumstances." 441 U.S. at 175.

## D. The discovery denial caused the summary judgment.

The causal link between the discovery denial and the summary judgment is direct and demonstrable. The district court granted summary judgment largely because Appellants did not dispute

Statement of Undisputed Fact No. 45, which recites that Interim Research Director Keegan Hankes "never had any reason to doubt" that DIS met SPLC's definition of an anti-immigrant hate group. Doc. 134 at 31. But the evidence necessary to contest that assertion—namely, SPLC's internal policies governing the designation process, its pre-2017 communications reflecting what it knew about DIS, and its methodology as applied to similarly situated groups—was precisely the discovery the court had denied. Doc. 88 at 1–3; Doc. 104 at 4–6. The district court thus erred because it denied Appellants the documentary evidence needed to prove an element of their defamation claim and then granted summary judgment on the ground that they failed to produce evidence of that element.

The district court observed that Appellants could "ask SPLC's witnesses during their depositions if they applied a different standard to Plaintiffs than to other groups." Doc. 104 at 5–6. Appellants took depositions. They deposed Beirich, Shanmugasundaram, and Levi. They did not depose Hankes, however, who was simply the staff member who allegedly approved the 2021 re-designation. Neither did SPLC. Doc. 134 at 38. So when the district court granted summary judgment, it rested on

37

Hankes's unrebutted declaration and Appellants' decision not to dispute SOF No. 45. *Id.* at 31. That was error.

As one court observed, "[p]arties incur prejudice because they do not have the benefit of the documents while selecting deponents, taking depositions, conducting third party discovery, and preparing [their] trial strategy and pre-trial documents." *DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 973 (N.D. Ill. 2021).

Consider what Appellants would have needed to make a deposition of Hankes meaningful. To ask why SPLC reversed a six-year assessment, they needed the internal communications from those six years. Those were denied. To ask whether he followed SPLC's standards, they needed the standards. Those were denied. To ask whether SPLC applied a different methodology to DIS than to other immigration groups, they needed the methodology materials. Those were denied. Such documents could have created a genuine issue of material fact as to actual malice. Yet they sat in SPLC's files, beyond Appellants' reach.

The depositions Appellants did take confirm the problem. Beirich testified that SPLC's process was thorough and based on "the totality of the information that [SPLC] collected about D.A. King." Doc. 114-7 at 31

38

(Beirich Dep. 114:21–22). Shanmugasundaram said the same. Doc. 114-8 at 8–9 (Shanmugasundaram Dep. 25:5–27:17). So did SPLC's Rule 30(b)(6) witness. Doc. 114-6 at 31 (Levi Dep. 116:3–22). Three witnesses. One story. No documents to test it against. A plaintiff cannot prove actual malice simply by asking hostile witnesses whether they acted with actual malice.

* * *

The circularity deserves emphasis. SPLC invoked a "reporter's privilege" to resist discovery. The magistrate judge denied discovery on relevance grounds. The district court then granted summary judgment because Appellants lacked evidence of what the editorial process would have revealed. At every stage, the evidence Appellants needed was the evidence they were told they could not have. This Court should reverse the discovery order, vacate the summary judgment, and remand for proceedings in which the evidentiary playing field is level.

39

**II.    The district court erred in confining its actual-malice analysis to the Spring 2021 re-designation while discounting the evidence from the 2017–2018 designation process.**

Even on the summary-judgment record the district court allowed, the evidence of actual malice was stronger than the court acknowledged. The district court's analysis obscured that evidence through a second analytical move: having limited the actionable claims to the 2021 re-designation through its timeliness ruling, Doc. 134 at 21–27, the district court then confined its actual-malice inquiry to that period alone and treated the substantial body of evidence from the 2017–2018 designation process as though it belonged to a different case, *id.* at 30–36. That was error.

**A.    The district court erred in analyzing actual malice as though SPLC's institutional knowledge started from scratch in 2021.**

The district court's actual-malice analysis began with a threshold ruling that structured everything that followed. Because Alabama's two-year statute of limitations barred claims arising from the 2018, 2019, and 2020 designations, the district court held that only the Spring 2021 re-designation was timely. Doc. 134 at 22–23. The district court then analyzed actual malice exclusively through the lens of the 2021 re-

40

designation. It found that Keegan Hankes, the SPLC supervisor who approved the 2021 re-designation, "never had any reason to doubt DIS met SPLC's definition of an anti-immigrant hate group." *Id.* at 31 (citing Doc. 114-15 ¶ 11). It found that Appellants had not disputed this fact. *Id.* And it concluded, on this basis, that "DIS admits that it cannot prove the facts needed for actual malice: knowledge of falsity, serious doubt about the truth, or reckless disregard of the truth." *Id.*

The district court did address the 2017–2018 evidence in Part V(A) of its opinion, but only to find that the theories Judge Watkins had identified at the Rule 12 stage had been undermined by discovery. Doc. 134 at 31–36. For example, the district court determined that DIS had conceded SPLC's broad definition of "immigrant," *id.* at 32–33, on the grounds that King had testified one could call DIS "anti-immigrant" under that definition, *id.* at 34 (citing Doc. 114-1). The district court also determined DIS had "abandoned" the lobbying-motive theory. *Id.* at 35. And the remaining motive evidence, the district court held, constituted irrelevant "evil intent or a motive arising from spite or ill will" under *Dershowitz. Id.* at 35–36.

41

At no point did the district court consider whether evidence from the 2017–2018 designation process was relevant to proving what SPLC knew when it renewed the designation in 2021. The district court treated the 2018 designation and the 2021 re-designation as analytically separate events, each requiring its own independent proof of actual malice.

That analytical framework is wrong for three reasons.

First, the statute of limitations bars "stale claims"; it does not bar relevant evidence. *See Just. v. United States*, 6 F.3d 1474, 1482 (11th Cir. 1993); *see also United States v. Ratcliff*, 245 F.3d 1246, 1255 (11th Cir. 2001) ("Statutes of limitations are not rules of evidence."). The district court's timeliness ruling determined which publications Appellants could sue on, not which evidence they could use to prove their case. Evidence of what SPLC knew in 2017 and 2018 is directly relevant to what SPLC knew in 2021, because SPLC's institutional knowledge does not reset with each calendar year.

When Hankes approved the 2021 re-designation, SPLC *as an institution* had everything it had accumulated, or should have had, since it first began monitoring DIS: Beirich's public acknowledgment that DIS

was not a hate group; finding that DIS was a legitimate organization not engaged in "anti-immigrant" activity, 114-7 at 34 (Beirich Dep. 128:22–25; 129:1–24)), DIS's consistent focus on *illegal* immigration, Doc. 114-1 at 43 (King Dep. 165:17–25); the composition of DIS's board, which includes immigrants, Doc. 114-3 at 7 (King Dep. 19:24–25; 20:1–25; 21:1–4); and that King's sister is a legal immigrant, Doc. 114-3 at 8 (King Dep. 23:1–9). Beirich's knowledge became SPLC's knowledge, which became Hankes's knowledge. *See generally* Rodney Smolla, 1 Law of Defamation § 3:115 (2d ed.) (citing jury instruction providing that, to determine a corporation's statement of mind, "you look at the beliefs of the persons [that the corporation] charged with responsibility for the content of the broadcast" (citation omitted)).

Second, the 2021 re-designation was not an independent editorial judgment. It was the renewal of a classification someone else created under circumstances that, viewed in the light most favorable to Appellants as the nonmoving party, *see Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996), support an inference of actual malice. Hankes did not investigate DIS individually. He reviewed an analyst's annual update and approved the continuation of an existing classification. Doc. 114-15

¶¶ 7, 10. That classification rested on Shanmugasundaram's original 2017 activation report and Beirich's original approval. Doc. 114-14 at CONF.0007–09; Doc. 114-7 at 28 (Beirich Dep. 104:14–105:11). A reasonable jury could conclude that Hankes's renewal was a rubber stamp and that the actual malice infecting the original designation carried through to every annual renewal built on it.

Third, and as discussed above, *Herbert* holds that the plaintiff may examine the full "editorial process" that produced the publication. 441 U.S. at 160. The editorial process for the 2021 re-designation did not begin in 2021. It began around 2011, when SPLC first began tracking DIS and King. Everything that followed—the activation report, the designation, the Extremist Profile, and each annual renewal—was a product of that process.

Confining the actual-malice inquiry to the 2021 decisionmaker's professed state of mind severs the conclusion from its institutional knowledge bank. It allows SPLC to shield a decade of accumulated knowledge behind a single employee's litigation declaration. And it treats a watchdog organization that tracked DIS for years as though it were a

newspaper reporter who wrote a single story on a deadline. This cascading series of errors warrants remand.

The district court treated almost none of this as relevant to actual malice. That was error.

## B. A reasonable jury could find that SPLC's treatment of Appellants before 2021 was probative evidence of actual malice.

Judge Watkins identified five factual theories at the Rule 12 stage that could establish actual malice. Doc. 22 at 49–54. The district court found at summary judgment that discovery supported none of them. Doc. 134 at 31–36. A closer look tells a different story. The first two theories (that SPLC ignored King's immigrant family and DIS's focus on illegal immigration) were analyzed under the wrong legal standard, as explained in Argument III. The third theory (that the designation served a lobbying strategy) was considered unsupported by evidence beyond temporal coincidence, but the pre-2017 communications that might have revealed the connection were denied in discovery. The fourth theory (that SPLC used Tanton as a pretext) was dismissed as motive evidence, categorically irrelevant under *Dershowitz*. The fifth theory (that SPLC conducted a less rigorous investigation because it had already decided to

45

designate) could not be tested because the methodology materials and internal communications were denied.

The theories did not fail on the merits. They were either starved of evidence or analyzed under the wrong law.

Consider what a reasonable jury could make of the evidence that does exist, viewed in the light most favorable to Appellants. A watchdog group tracks an advocacy organization for six years and publicly concludes it does not warrant a "hate group" designation. The organization's activities do not change. Then, within weeks of a single phone call, Doc. 114-7 at 23 (Beirich Dep. 85:5–25), the organization announces it will "take a new look," Doc. 114-14 at CONF.0004. Two months later, the "hate group" designation is made, citing activities that had been ongoing for years. And the group's internal editorial-process documents could reveal what actually drove the reversal.

That is the kind of evidence from which a reasonable jury could infer that the designation was made with knowledge of its falsity or reckless disregard for the truth. *See Harte-Hanks*, 491 U.S. at 692 ("the purposeful avoidance of the truth is in a different category"); *St. Amant*, 390 U.S. at 732 ("there are obvious reasons to doubt the veracity of the

46

informant or the accuracy of his reports"). The district court should have considered it. Instead, the district court looked only at 2021, found only Hankes's declaration, and stopped.

Thus, the district court's actual-malice analysis rested primarily on a single proposition: Keegan Hankes, the Interim Research Director who approved the 2021 re-designation, never doubted that DIS met SPLC's definition of an anti-immigrant hate group. Doc. 134 at 31, 37–38. But actual malice is not the exclusive province of one person within an institutional defendant. As the Supreme Court explained in *New York Times*, the actual malice standard must be "brought home to the persons in the [defendant's] organization having responsibility for the publication." 376 U.S. at 287. The Court used the plural advisedly. Where multiple individuals within an organization participate in the publication of a defamatory statement, the actual malice inquiry extends to all of them. *See* Smolla, 1 Law of Defamation § 3:42.50.

The 2018 designation of DIS as an "anti-immigrant hate group" was the product of exactly such a multi-actor process. Shanmugasundaram prepared the activation report; Senior Research Analyst Piggott transferred it to the Research Director; Director of Research Amend

47

received the proposal; and Beirich approved it. Doc. 114-6 (Levi Dep. 118:11–17); Doc. 114-7 (Beirich Dep. 104:14–105:11). The 2021 re-designation Hankes approved was built directly on that institutional foundation.

Even accepting the district court's conclusion, Beirich is the person whose state of mind is most directly relevant to the actual-malice inquiry. She had over a decade of institutional knowledge about DIS. She publicly acknowledged in 2011 that DIS was not a hate group. Doc. 114-10 at 3. She initiated the 2017 reinvestigation after learning of the DIS-US Inc. connection. Doc. 114-7 (Beirich Dep. 85:5–25). She gave final approval for the 2018 designation. Doc. 114-7 (Beirich Dep. 104:14–105:11). And she remained involved in re-designations through at least 2019, supervising Shanmugasundaram's confirmation that DIS remained active. Doc. 114-7 at 5 (Beirich Dep. 13:11–16). The district court never examined her state of mind. It examined only Hankes's declaration, submitted by SPLC in lieu of a deposition, and treated his profession of good faith as dispositive of the entire institutional inquiry. Doc. 134 at 37–38.

An institutional defendant cannot escape liability through precisely the strategy the district court permitted here: selecting one person as the

48

face of the publication decision, obtaining a self-serving declaration from that person, and leaving the states of mind of everyone else who contributed to the decision unexamined. *See* Smolla, 1 Law of Defamation § 3:42.50. *Harte-Hanks* forecloses that approach: "the reviewing court must consider the factual record in full" in assessing actual malice. 491 U.S. at 688. The district court did the opposite.

### III. The district court applied incorrect legal standards for actual malice.

Two legal errors pervaded the district court's actual-malice analysis. The district court conflated actual malice with the defense of truth, and it conflated actual malice with common-law ill-will malice. Doc. 134 at 34–35, 36, 39. Each error independently warrants reversal. Together, they drained what remained of Appellants' evidence—already diminished by the discovery denial and the 2021 limitation—of its probative force. The "no evidence" conclusion was the inevitable product of these compounding errors.

## A. The district court treated SPLC's internal definition of "immigrant" as dispositive rather than applying the ordinary-reader standard.

The district court's analysis of the "anti-immigrant" designation proceeded from a premise that, once accepted, made the conclusion inescapable. The premise: DIS (ostensibly) conceded SPLC's broad definition of "immigrant" (encompassing persons who enter the country either legally or illegally), and King testified that one could call DIS "anti-immigrant" under that definition. Doc. 134 at 32–34. The conclusion: "once DIS concedes that designating DIS as 'anti-immigrant' was true from SPLC's point of view, then DIS cannot prove actual malice." *Id.* at 34–35.

The problem is that the premise does not support the conclusion. Claims of subjective truth from the speaker's point of view do not negate the element of actual malice. It is the test for *the defense of truth*—that is, whether the allegedly defamatory statement was *in fact* provably true. The fact that SPLC's employees after the fact now claim that they believed in the truth of their statements about Appellants cannot alone defeat summary judgment. *See St. Amant*, 390 U.S. at 732 ("The defendant in a defamation action ... cannot ... automatically insure a

50

favorable verdict by testifying that he published with a belief that the statements were true."). And where the record contains a genuine dispute of fact about the truth of a given statement, the court may not decide the issue but submit the question to the jury. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) ("[W]hen competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible.").

Actual malice asks a different question. It asks whether the publisher knew or recklessly disregarded that its statement, *as understood by the ordinary reader*, circulated false information. *See New York Times*, 376 U.S. at 279–80. A statement can be "true" under an internal definition yet false and defamatory under the ordinary meaning. So the relevant question is not whether DIS fits SPLC's internal definition of "anti-immigrant." It is whether SPLC knew that the ordinary reader would understand "anti-immigrant" to mean something that DIS is not.

The term "anti-immigrant" has a specific, commonly understood meaning: "it indicates that one is opposed to the introduction of all foreign-born people to this country." Doc. 123 at 9. DIS did not oppose

51

legal immigration. DIS's board included legal immigrants. Doc. 114-1 at 43 (King Dep. 165:17–25); Doc. 114-3 at 7 (King Dep. 19:24–25; 20:1–25; 21:1–4). King's sister was a legal immigrant. Doc. 114-3 at 8 (King Dep. 23:1–9). It opposed illegal immigration through the political process, Doc. 114-1 at 43 (King Dep. 165:17–25), as Beirich herself acknowledged in 2011, Doc. 114-10 at 3.

The 2018 Intelligence Report, where the designation first appeared, did not define "anti-immigrant." Doc. 114-6 at 14 (Levi Dep. 46:2–47:11). So an ordinary reader encountering the designation on the Hate Map would have no way of knowing that SPLC privately intended "anti-immigrant" to include opposition to illegal immigration. The reader would understand the term according to its ordinary meaning: DIS opposed and "vilified" *all* immigrants, including legal immigrants. That is false. The question the district court should have asked is whether a jury could reasonably find that SPLC knew it was false as the ordinary reader would understand it.

The district court never asked that question. It asked instead whether DIS fit SPLC's unique and uncommon definition, found that it did, and stopped there.

52

Under this approach, any publisher could immunize itself from an actual-malice finding by adopting a private definition of a term, applying it consistently, and posting the definition somewhere on its website. Such a practice is not an answer to actual malice. Actual malice is a subjective inquiry into the publisher's state of mind, *see St. Amant*, 390 U.S. at 731, and one that cannot be answered by reference to a publisher's private lexicon. And because "[t]he proof of 'actual malice' calls a defendant's state of mind into question," that "does not readily lend itself to summary disposition." *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n.9 (1979) (citing *New York Times*, 376 U.S. at 254).

This Court's decision in *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247 (11th Cir. 2021), does not compel a different result. That case addressed only the general "hate group" label, an inherently subjective term whose meaning is, as the court acknowledged, "highly debatable and ambiguous." 6 F.4th at 1252 n.7. The Court left open "whether the term hate group is definable in such a way that it is provable as false." *Id.*

The term "anti-immigrant" raises a different question. Unlike "hate group," the word "immigrant" has a commonly understood public

53

meaning and a federal statutory definition. 8 U.S.C. § 1101(a)(15) (defining "immigrant" as "every alien" except for enumerated classes of "nonimmigrant aliens"); Doc. 22 at 48. A reasonable reader encountering "anti-immigrant hate group" would understand the term to mean opposition to *all* immigrants, not merely opposition to aliens who entered or stayed in the United States illegally. Whether SPLC knew its label would convey that broader meaning is a question *Coral Ridge* did not reach.

Nor does King's deposition testimony change the analysis. When asked about his 2005 statement that "once people start calling illegal border crossers 'immigrants,' … they can call groups like his 'anti-immigrant,'" King affirmed the sentiment. Doc. 114-1 at 42 (King Dep. 159:16–17). The district court read this as a concession that the designation was true. Doc. 134 at 34. King's acknowledgement cannot fairly be termed a "concession." In fact, King had to agree that, if one takes the liberty of privately re-defining "anti-immigrant" to include "illegal immigrants," then of course his longstanding advocacy for restrictions on illegal immigration was "anti-immigrant" according to that personal definition. In any event, the district court's aggressive

54

interpretation that King had "conceded" the matter drew the inference against the *nonmovant*, which is the opposite of what summary judgment requires. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

At most, King's testimony was ambiguous. He was reacting to a manipulation of a word's ordinary meaning. A reasonable jury could understand that testimony not as a concession that the designation was accurate but as an acknowledgment that SPLC engaged in linguistic tomfoolery: it used a term whose ordinary meaning (opposition to *all* immigrants) is broader than SPLC's private meaning (opposition also to illegal immigrants), knowing the ordinary reader would receive the broader meaning. The ordinary reader would understand SPLC's claim that King and DIS were an "anti-immigrant hate group" to mean that they were racists who hated legal immigrants instead of law-abiding citizens seeking to encourage the enforcement of laws limiting illegal immigration. That is evidence of actual malice, not evidence against it.

Judge Watkins saw this clearly at the Rule 12 stage. He found that SPLC's designations were factual assertions, not opinion, because SPLC holds itself out as a "premier" investigative organization that "offers expert analysis to the media and public." Doc. 22 at 37–38. A reasonable

55

reader would understand the designation as "factually based after extensive investigation," not as a term of art that means only what SPLC privately intends. *Id.* at 38. The district court's opinion departed from this analysis without acknowledging the departure.

The district court's Footnote 9 deepened the error. In dicta addressing the time-barred "Extremist Profile" claim, the district court concluded that DIS's purported focus on vilifying "all" immigrants is "non-actionable rhetorical hyperbole" under *Horsley v. Rivera*, 292 F.3d 695, 702 (11th Cir. 2002). Doc. 134 at 27 n.9. This passage conflates two distinct First Amendment inquiries. Rhetorical hyperbole is a falsity doctrine: it asks whether a statement is susceptible of being proved true or false. *See Horsley*, 292 F.3d at 701 (citing *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990)). Actual malice is a state-of-mind doctrine: it asks whether the speaker subjectively doubted or recklessly ignored the truth. *See Harte-Hanks*, 491 U.S. at 668.

The district court used a falsity concept to resolve an actual-malice question. That is a categorical error.

The error is compounded by the district court's implicit reliance on *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991), which

*Dershowitz* cited. *Masson* addressed whether a journalist who deliberately altered quotations acted with actual malice. The Court held that a deliberate alteration of a plaintiff's words does not equate with knowledge of falsity because the statements were "substantially true," and did not result in a material change in the statement's meaning. *See id.* at 517. That holding concerns the accuracy of quotation: whether altering a speaker's words changes what the speaker said.

The question here is different. It concerns the accuracy of labeling: whether a self-defined, private label misleads the public about the nature of the labeled organization. SPLC did not misquote King; it applied a label whose ordinary meaning conveys something SPLC knew to be false about DIS. *Masson*'s framework for evaluating altered quotations does not resolve the distinct question whether a publisher who uses a term with a known gap between its private definition and its public meaning acts with knowledge of falsity.

As for *Horsley*, that case was about a talk-show host who called an anti-abortion activist an "accomplice to murder" during a heated live broadcast in which both participants were speaking on "an animated, non-literal plane." 292 F.3d at 698, 702. By contrast, SPLC's "Extremist

Profile" is a researched, edited, and (purportedly) fact-checked publication by an organization that markets itself as the nation's foremost authority on domestic extremism. It is distributed to journalists and law enforcement. Amazon relied on it to exclude Coral Ridge from the AmazonSmile program. *See Coral Ridge*, 6 F.4th at 1250–51. Judge Watkins drew the distinction between this kind of publication and *Horsley*'s rhetorical context at length. Doc. 22 at 37–40. Footnote 9 collapsed it in two sentences.

## B. The district court treated evidence of motive as categorically irrelevant.

This was the district court's most consequential error.

Circumstantial evidence established that SPLC reversed a six-year assessment of DIS within weeks of believing that DIS was tied to the so-called "Tanton Network" and that the designation served SPLC's institutional interests in both lobbying and fundraising. Doc. 114-7 at 24 (Beirich Dep. 86:9–87:15); *id.* at 39 (148:14–149:9). The court dismissed this evidence in a single paragraph, citing *Dershowitz* for the proposition that "'evil intent or a motive arising from spite or ill will'" does not prove actual malice. Doc. 134 at 35–36 (citing 153 F.4th at 1193). The district court concluded: "Because 'all that matters are the speakers' subjective

58

beliefs about the truth of their own statements,' not their intent or motive, DIS's argument for actual malice cannot prove actual malice." *Id.* at 36 (internal citation omitted).

The general principle the district court cited is correct. Motive *alone* does not equal actual malice, and a publisher can despise the subject of a publication and still sincerely believe in the truth of what it publishes. *See Masson*, 501 U.S. at 510.

But the principle the district court *applied* was wrong. The district court treated motive evidence as categorically inadmissible. That is not what *Dershowitz* holds, and it is not what the Supreme Court has said: "Although courts must be careful not to place too much reliance on such factors, a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence," and "*it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry.*" *Harte-Hanks*, 491 U.S. at 668 (emphasis added). The Court affirmed a finding of actual malice supported in part by evidence of the newspaper's motive to discredit a political candidate. *Id.* at 682–83, 691–92.

59

*Dershowitz* simply restated the familiar principle from *Masson* that ill-will malice is not an element of constitutional actual malice. That principle is a truism, not a rule of exclusion. It tells courts what motive evidence does not alone prove (the element itself). It says nothing about what motive evidence *may* prove (circumstantial support for an inference that the publisher harbored subjective doubts).

At any rate, "one who is seeking to harm the subject of a story … is more likely to publish recklessly than one without such motive." *Tavoulareas v. Piro*, 759 F.2d 90, 98 (D.C. Cir. 1985), *vacated on other grounds*, 817 F.2d 762 (D.C. Cir. 1987) (en banc). Courts addressing this question have agreed. *See, e.g.*, *Shoen v. Shoen*, 48 F.3d 412, 417 (9th Cir. 1995) ("ill will is considered circumstantial evidence of actual malice"); *Duffy v. Leading Edge Prods.*, 44 F.3d 308, 315 n.10 (5th Cir. 1995) ("[E]vidence of ill will can often bolster an inference of actual malice."); *Spirito v. Peninsula Airport Comm'n*, 350 F. Supp. 3d 471, 482 (E.D. Va. 2018) (same, citing *Harte-Hanks*).

The motive evidence here is substantial, and sufficient to create genuine issues of material fact as to actual malice that can only be resolved by a jury.

60

For example, a jury could find that SPLC's decision to reverse its longstanding description of DIS was driven by its stated goal of targeting what it calls the "Tanton Network," not by any new evidence that DIS had become an anti-immigrant organization. Doc. 114-7 at 24 (Beirich Dep. 86:9–87:15); *id.* at 39 (148:14–149:9). A jury could weigh that DIS never publicly or privately embraced Tanton's rhetoric or adopted his perspectives, Doc. 114-3 at 33 (King Dep. 124:8–125:9), and affirmatively and repeatedly disavowed those viewpoints at every opportunity, *id.* at 5 (12:17–13:14), 8 (24:11–25:2), 9 (27:8–28:3), 10 (32:12–25), 11 (36:12–37:4). A jury could consider how DIS's own board includes immigrants and that DIS consistently voiced support for legal immigration. *Id.* at 20 (70:9–18); Doc. 114-5 at 24 (King Dep. 238:9–15), 25 (244:3–15), 26 (248:4–15). And a jury could find that SPLC's own pre-2018 statements demonstrate that it knew DIS was not anti-immigrant before making its designation. Doc. 114-7 at 16 (Beirich Dep. 55:8–24), 23 (82:2–6), 27 (101:13–25), 28 (102:1–14), 34 (128:22–129:24).

Based on the cumulative weight of this evidence, a reasonable jury could conclude that SPLC had institutional reasons to designate DIS that had nothing to do with whether DIS actually met SPLC's criteria. A

61

reasonable jury thus could infer from this evidence that SPLC's decisionmakers knew or recklessly disregarded that the designation was not warranted, and designated DIS because the designation served other purposes.

That being so, the district court was required to consider this evidence as part of the totality of the circumstantial record and to draw from it the reasonable inferences most favorable to Appellants. *See Anderson*, 477 U.S. at 255. By treating it as categorically irrelevant, the district court removed one of the pillars of Appellants' case and then concluded, predictably, that the structure could not stand.

IV. **The district court erred in predicting that Alabama would apply the single-publication rule to bar the Extremist Profile claim.**

The Extremist Profile states that DIS "poses as an organization concerned about immigration issues, yet focuses on vilifying all immigrants." Doc. 114-12 at 7. This statement names King. It accuses DIS of deception, of "posing." And it makes a specific, verifiable factual claim: that DIS "vilifies all immigrants." If this claim survives, then the 2018 evidence re-enters the case naturally, the actual-malice analysis proceeds under the correct legal standards, and the editorial-process

discovery becomes available. The district court dismissed this claim on statute-of-limitations grounds. That dismissal rested on three analytical choices, each of which was wrong.

### A. Alabama has not adopted the single-publication rule for internet posts.

The Alabama Supreme Court has never applied the single-publication rule to internet publications. The district court acknowledged it was "predicting" how Alabama would rule. Doc. 134 at 25. This Court reviews such predictions de novo. *See Price*, 416 F.3d at 1334 ("We review de novo the district court's determination of state law."). Appellants recognize that the prediction may prove correct as a general matter and preserve the argument that the rule should not be extended, but the stronger arguments concern the rule's application in this case.

### B. The rule protects "newspapers and similar media," and SPLC is neither.

The Alabama Supreme Court stated that the single-publication rule is "generally applicable only to newspapers and similar media." *Poff v. Hayes*, *supra*, 763 So. 2d at 242 n.5. The district court did not address whether SPLC qualifies as a "newspaper" or "similar media." It assumed

the rule applied because internet posts, like newspapers, "project the same words to viewers across many locations." Doc. 134 at 26.

That reasoning looks at the medium and ignores the publisher. *Poff*'s limitation is about who gets the benefit of the rule, not what technology they use to publish. The rule originated in *Age-Herald Publishing Co. v. Huddleston*, 92 So. 193, 196–97 (Ala. 1921), where the Alabama Supreme Court addressed the mechanical reproduction of identical newspaper copies. The rule protects newspapers because they print the same words on multiple copies and distribute them to multiple locations; each copy reaching a new reader is not a new editorial act.

SPLC's Extremist Profile is not a static, unchangeable and mechanically reproduced newspaper article. It is a targeted advocacy product, maintained on an interactive website, linked to an annual publication cycle, and updated as part of SPLC's "hate group" advocacy and fundraising program.

## C. Alabama's rule requires "verbatim republication," and the profile was not republished verbatim.

*Poff* states that the single-publication exception "only applies to situations where subsequent acts of defamation are verbatim republications of previously made libelous or slanderous statements."

763 So. 2d at 242 n.5 (emphasis in original). The district court found the introductory sentence unchanged and concluded the profile presented "the identical libel." Doc. 134 at 26–27. It dismissed the modifications to the rest of the document, including the removal of a racial slur and the updating of six hyperlinks, as "red herrings." *Id.* at 27.

The district court's analysis isolated a single sentence from a 3,100-word document and declared it unchanged. But *Poff* speaks of "verbatim republications," not verbatim sentences. The Extremist Profile, the Intelligence Report, and the Hate Map are a single, integrated publication. A reader does not encounter the introductory sentence in a vacuum; it encounters it as the gateway to linked and cross-referenced materials, and that includes quotations, background sections, social media excerpts, and hyperlinks to external content. Doc. 114-12 at 7–17. When SPLC removed a racial slur from a quoted passage, it changed the document the reader encounters. When SPLC updated hyperlinks, it changed the pathways through which the document connects to other material. Under Alabama's strict "verbatim" standard, these modifications mean the profile as published in 2020 or 2021 is not the "identical" profile published in January 2019.

65

**D. SPLC's annual re-dissemination constituted republication to a new audience.**

Even if the rule applies to internet posts, and even if the introductory sentence alone satisfies the "verbatim" requirement, the rule does not protect publishers who affirmatively redistribute a publication to a new audience.

The leading case is *Rinaldi v. Viking Penguin, Inc.*, 52 N.Y.2d 422 (1981). There, the New York Court of Appeals held that a paperback edition of a book constituted a new publication even though the defamatory text was identical. The only differences were cosmetic: a new cover, a new publisher's name, a revised title page. *Id.* at 430. The court reasoned that "republication, retriggering the period of limitations, occurs upon a separate aggregate publication from the original, on a different occasion," and that "the subsequent publication is intended to and actually reaches a new audience." *Id.* at 432. Thus it is the effort to reach a new audience, and not the content of the publication, that can make a recurrent publication of the libel into a new publication.

SPLC's Extremist Profile is a component of SPLC's annual Hate Map cycle. Each year, SPLC releases an updated Hate Map and accompanying annual report with press outreach, media engagement,

66

and fundraising appeals. Doc. 21 ¶¶ 9–10; Doc. 114-6 at 24 (Levi Dep. 87:6–25; 88:1–9). Each release drives traffic to SPLC's website, including the Extremist Profile pages. The profile is linked from the Hate Map and accessible through it. SPLC's annual cycle is the functional equivalent of *Rinaldi*'s paperback: same substance, new distribution, new audience. The district court did not address this argument.

* * *

If this Court reverses on the single-publication rule, then the Extremist Profile claim proceeds on remand. The actual-malice analysis for that claim incorporates the 2017–2018 evidence (Argument II), applies the correct ordinary-reader standard (Argument III.A), permits consideration of motive evidence (Argument III.B), benefits from editorial-process discovery (Argument I), and evaluates the evidence cumulatively (Argument I.A). The district court's Footnote 9 dicta, which declared the Extremist Profile statement rhetorical hyperbole and suggested it might be opinion, was infected by the same errors that pervaded the court's treatment of the "anti-immigrant" designation. Judge Watkins's Rule 12 analysis, which found the statement factual and not opinion because SPLC holds itself out as an expert investigative

67

organization, was the correct starting point. Doc. 22 at 37–38. On remand, this claim should receive its due justice.

## CONCLUSION

For the above reasons, this Court should reverse the discovery order and summary judgment, remand for completion of editorial-process discovery and renewed summary judgment proceedings under the correct legal standards, and reverse the application of the single-publication rule to Count 4.

Dated: April 16, 2026                    Respectfully submitted,

                                         s/ Horatio G. Mihet

Todd V. McMurtry                         Mathew D. Staver
Scott R. Thomas                          Horatio G. Mihet
J. Will Huber                            Daniel J. Schmid
FINNEY LAW FIRM LLC                      LIBERTY COUNSEL
250 Grandview Dr., Ste. 500              P.O. Box 540774
Fort Mitchell, KY 41017                  Orlando, FL 32854
(859) 578-3855                           (407) 875-1776
todd@finneylawfirm.com                   court@lc.org
scott@finneylawfirm.com                  hmihet@lc.org
will@finneylawfirm.com                   dschmid@lc.org

                                         James R. McKoon, Jr.
                                         MCKOON & GAMBLE
                                         P.O. Box 3220
                                         Phenix City, AL 36868
                                         (334) 297-2300
                                         jrmckoon@aol.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 12,889 words, excluding the parts of the brief exempt by Fed. R. App. P. 32(f) and Eleventh Circuit Local Rule 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using a proportionally spaced typeface using 14-point Century Schoolbook font.

Respectfully submitted,

s/ Horatio G. Mihet
Horatio G. Mihet

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on April 16, 2026.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Respectfully submitted,

s/ Horatio G. Mihet
Horatio G. Mihet

*Counsel for Plaintiffs-Appellants*

71